98

John S. Chmill, David Hirosky, John G. Holtz, Thomas Pflum, David J. Puciata, Lawrence T. Yakich and Paul R. Myers, Appellants *v.* City of Pittsburgh, Pittsburgh Civil Service Commission and Stephen A. Glickman, Appellees.

Argued May 4, 1977, before President Judge Bow-
MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MENCER, ROGERS and BLATT.

*Christopher LePore,* with him *Stanford A. Segal,* and *Gatz, Cohen, Segal & Koerner,* for appellants.

*Clifford C. Cooper* and *Robert B. Smith,* with them *Daniel M. Curtin,* First Assistant City Solicitor, and *Mead J. Mulvihill, Jr.,* City Solicitor, for appellees.

OPINION BY JUDGE MENCER, July 15, 1977:

John S. Chmill, David Hirosky, John G. Holtz, Thomas Pflum, David J. Puciata, Lawrence T. Yakich, and Paul R. Myers (appellants) are individuals who reside in the City of Pittsburgh. In August of 1975, appellants took a physical performance examination to become certified and hired as firefighters for the City of Pittsburgh. Out of approximately 1500 persons who took the test, appellants were ranked between slot No. 15 and slot No. 21 on the competitive list of applicants who have passed the examination for the position of firefighter.

The City of Pittsburgh requested the Civil Service Commission of that city to certify, for purposes of appointment and hiring, the names of 20 individuals for the position of firefighter. In response to this request, the Commission, on March 23, 1976, decided to certify 50 percent white male candidates and 50 percent minority, including female, candidates, rather than to certify the 20 individuals who were at the top of the competitive list, as prescribed by Section 3.1 of the Act of June 27, 1939, P.L. 1207, *as amended, added by* the Act of July 3, 1963, P.L. 186, §2, 53 P.S. §23493.1, Subsection (a) of Section 3.1 reads as follows:

(a)   Both original appointments and promotions to any position in the competitive class in any bureau of fire in any city of the second class

shall be made only from the top of the competitive list: Provided, however, That the appointing officer may pass over the person on the top of the competitive list for just cause in writing. Any person so passed over shall, upon written request, be granted a public hearing before the Civil Service Commission.

As a result of the Commission's decision to use a quota system, the appellants were not hired as firefighters by the City of Pittsburgh. This appeal has been argued on the premise that, if the Act had been followed, the appellants would have been certified and hired to the firefighter positions.

The appellants filed a complaint in equity, seeking to enjoin the City of Pittsburgh from hiring any firefighters until their status could be ascertained and the Pittsburgh Civil Service Commission from certifying any applicants to the position of firefighter for the City of Pittsburgh until their status could be ascertained and also seeking the issuance of an order requiring the Civil Service Commission to maintain the current eligibility list during the pendency of the litigation and an order directing the Civil Service Commission to certify appellants to the position of firefighter for the City of Pittsburgh. Appellants also filed appeals with the Pittsburgh Civil Service Commission, which were denied, and thereafter filed further appeals with the Court of Common Pleas of Allegheny County. The trial court consolidated the appeals from the decisions of the Pittsburgh Civil Service Commission with the equity suit. On June 4, 1976, the trial court denied the relief sought by appellants in their equity action and further dismissed their statutory appeals, thereby affirming the determination of the Pittsburgh Civil Service Commission to certify 20 individuals for the position of firefighter in the City of Pittsburgh according to a quota system providing

for 50 percent of the individuals certified to be members of minority groups. This appeal followed.

The law of this Commonwealth is that appellate courts, when considering appeals from the grant or refusal of a preliminary injunction, will look no further than a determination of whether reasonable grounds appear for the trial court's granting or refusing of the preliminary injunction. *McMullan v. Wohlgemuth,* 444 Pa. 563, 281 A.2d 836 (1971). Even with that narrow standard of review in mind, we conclude that the refusal to grant the relief sought by the appellants in this case was inappropriate and the order entered by the trial court must be reversed.

The trial court stated that "[i]t is admitted and apparent that the defendants [appellees] violated the express terms of the Civil Service Act" and continued: "Original [appointments] must be made 'from the top of the competitive list.' The defendants' [appellees'] quota system deviates from this straight down the list approach in the Act. The purpose of the Civil Service Act was to guarantee that appointments would be made solely on the basis of merit, to obtain the best man or woman for the job."

Having so concluded, we believe the trial court should have entered an appropriate order reflecting such conclusions. It is an accepted view in this Commonwealth that no employee in the civil service may be appointed, transferred, reinstated, promoted, or discharged in any manner or by any means other than those specified by statutes regulating civil service. *McGrath v. Staisey,* 433 Pa. 8, 249 A.2d 280 (1968). The Pittsburgh Civil Service Commission's unilateral decision to implement a quota system was a violation of the Act of June 27, 1939 and established a clear right to relief for the appellants.

However, the trial court reasoned that "the federal and state civil rights acts and the federal and state

constitutions take precedence over the civil service acts where the potential of discriminatory application is present." Our examination of that premise, when utilized to justify a quota system, convinces us that the trial court was simply in error in this assertion. Civil service laws, like civil rights laws, were enacted to ameliorate a social evil. In the former case, it was the spoils system; in the latter, discrimination. *Kirkland v. New York State Department of Correctional Services*, 520 F.2d 420, *reh. en banc denied*, 531 F.2d 5 (2d Cir. 1975).

Our consideration commences with a whole-hearted endorsement of Chief Justice STONE's comment in *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943): "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."

However, a racial quota is derogatory of and patronizing to the intended beneficiary minority. As was stated in *Fraternal Order of Police v. City of Dayton*, 35 Ohio App. 2d 196, 301 N.E. 2d 269, 271 (1973), "[n]o doubt all will agree in the abstract that any discrimination in the classified service because of race, color or religious or political faith or conviction is not only legally, but also morally, wrong, and wholly indefensible. But the cure for discrimination is not more discrimination. Such a course would but compound and aggravate the existing evil. The precious, hardwon victory over race discrimination must not be lightly bartered away for illusory temporary advantage."

Our examination of the Pennsylvania Human Relations Act[1] reveals no provisions that would impose a

---

[1] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §951 et seq.

racial hiring quota system which would exclude qualified persons such as the appellants solely because of their race. On the contrary, Sections 2 and 5 of the Act[2] would prohibit employers from imposing arbitrary and discriminatory hiring quotas. Section 2(b) reads as follows:

> (b) It is hereby declared to be the public policy of this Commonwealth to foster the employment of all individuals in accordance with their fullest capacities regardless of their race, color, religious creed, ancestry, handicap or disability, use of guide dogs because of blindness of the user, age, sex, or national origin, and to safeguard their right to obtain and hold employment without such discrimination, to assure equal opportunities to all individuals and to safeguard their rights at places of public accommodation and to secure commercial housing regardless of race, color, religious creed, ancestry, sex, handicap or disability, use of guide dogs because of blindness of the user or national origin.

Section 5 provides in pertinent part:

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
>
> (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability of any individual to refuse to hire or em-

---

2 43 P.S. §§952, 955.

ploy, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required. . . .

(b) For any employer, employment agency or labor organization, prior to the employment or admission to membership, to

. . . .

(3) Deny or limit, through a quota system, employment or membership because of race, color, religious creed, ancestry, age, sex, national origin, non-job related handicap or disability or place of birth.

A reading of these sections of the Pennsylvania Human Relations Act persuades us that the quota system of hiring as advocated here by the Pittsburgh Civil Service Commission denies appellants positions for which they are qualified, on the sole basis that they are of the white race, and consequently such denial is a violation of the Pennsylvania Human Relations Act.[3] Accordingly, the trial court was in error in its conclusion that, under the facts of this case, the Pennsylvania Human Relations Act transcends the applicable civil service act.

Next we turn to the trial court's assertion that Title VII of the Civil Rights Act of 1964 takes precedence

---

[3] In *McDonald v. Santa Fe Trail Transportation Co.*,    U.S. , 49 L. Ed. 2d 493 (1976), the Supreme Court held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., was applicable to whites who had been discriminated against in favor of a black. The Court concluded that the Act is not limited to discrimination against members of any particular race. We cannot believe that the provisions of the Pennsylvania Human Relations Act would be construed otherwise.

over the civil service act in question here. Again, we find the contrary to be true. Section 703(j) of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(j), provides:

Preferential treatment not to be granted on account of existing number or percentage imbalance

(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-31 (1971), it was stated:

Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority

group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

It seems evident that no minority group member may be hired on the basis of race and that the trial court was in error when it concluded that the provisions of the Federal Civil Rights Act requires a result different from that which would be achieved by adherence to the provisions of the applicable civil service act.

Turning to the constitutional aspects of the trial court's assertion that there is "a higher law than the Civil Service Act," we need consider *Washington v. Davis*, 426 U.S. 229 (1976). In *Washington*, it is stated that the Supreme Court has not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact. The applicable civil service act establishes a racially neutral qualification for employment; namely, appointment by merit only. It was designed to prevent political patronage and to curb hiring on the basis of the personal preference of those entrusted with that prerogative. The guiding principle of the act was that the best qualified man or woman would be appointed to every position. Thus, it is specifically provided that the appointing officer may pass over the person on the top of the competitive list only for just cause in writing. Accordingly, we have difficulty understanding how such a law establishing a racially neutral qualification for employment could be considered racially discriminatory solely because a greater proportion of blacks failed to quali-

fy than members of other racial or ethnic groups. *Washington v. Davis, supra,* held that such racially neutral statutes are not in contravention of the Equal Protection Clause of the Fourteenth Amendment.

We cannot place our imprimatur on a quota system of hiring which by necessity must create castes and divide our society. Our view is consonant with that of the Supreme Court of California, which found that a school admissions program which set aside class openings for disadvantaged minorities was invalid because the procedure could result in acceptance of minority students whose qualifications were inferior to those of white applicants, with resulting invidious discrimination. *Bakke v. Regents of University of California,* 18 Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976), *cert. granted,* U.S. , 51 L. Ed. 2d 535 (1977).

Likewise, our decision today comports with the recent holding of the Supreme Court of New Jersey, which held, in *Lige v. Town of Montclair,* 72 N.J. 5, 367 A.2d 833 (1973), that the use of racial quotas to remedy past discrimination violates a provision of the New Jersey constitution mandating that no person should be discriminated against because of religious principles, race, color, ancestry, or national origin.

Therefore, we must conclude that the trial court offered no supportable basis for its order denying the relief sought by the appellants.

Two other matters merit brief discussion.

First: The specific issue of racial discrimination in the recruiting, testing, and hiring of firefighters by the City of Pittsburgh was the subject of a recent federal court case in the Western District of Pennsylvania. *Pennsylvania v. Glickman,* 370 F. Supp. 724 (W.D. Pa. 1974). In that case, Judge Teitelbaum found that the disparities between the black population in the City of Pittsburgh and black representa-

tion in the City's Bureau of Fire and between the passing rates for black applicants and white applicants on the civil service eligibility examination demonstrated a prima facie showing of de facto discrimination.[4] The Court addressed the issue of whether the employment practice which operated to exclude minorities (the written examination) was substantially related to job performance, and, in applying the test established in *Griggs v. Duke Power Co., supra,* the federal court found that the firefighters' written examination was not constructed or administered so as to test for those factors necessary to job performance. In *Glickman,* the Court ordered a remedy directed at the development of a nondiscriminatory and job-related examination. The Court further ruled that the Civil Rights Act of 1964 did not require the hiring of minority group members on the basis of race, and the Court specifically rejected the imposition of racially oriented quotas with respect to the hiring of City firefighters.

Subsequent to the *Glickman* decision, the City of Pittsburgh discontinued the use of written examination in connection with hiring of firefighters and adhered solely to an expanded physical performance examination which was validated and presided over by impartial examiners. It is interesting to note that the examination was administered after extensive advertising in an effort to insure that minorities would be

---

[4] The *Glickman* court determined in 1974 that, while 20 percent of the population of the City of Pittsburgh was made up of blacks, only between 3 percent and 4 percent of the Pittsburgh Bureau of Fire was black. The record in this case discloses that, as of May 13, 1976, there were 1047 persons employed by the Pittsburgh Bureau of Fire, of which 992 were white and 55 were members of minority groups. Thus, in May of 1976, 94.75 percent of the Bureau's employes were white and 5.25 percent were minority persons. Since June 4, 1974, 163 persons were hired by the Pittsburgh Bureau of Fire, of which 21, or 13 percent, were members of minority groups.

apprised of the impending examinations. The advertising campaign was so effective that over 1500 persons took the examinations. Of the 1161 persons who passed with a score of 75 or better, 360, or 31 percent were blacks. It is significant, not only that the examination given was a validated one, but that there has been no claim made that the examination was not job related or was discriminatory as was the written test dealt with by the federal court in *Glickman*.

Further, it should be noted that the appellees in this case filed a petition for removal of the present action from the Court of Common Pleas of Allegheny County to the United States District Court for the Western District of Pennsylvania, and the District Court denied such petition for removal and granted appellants' motion for remand to the Court of Common Pleas of Allegheny County. In its supporting opinion, it made the following observation: "Indeed, in the instant case, it may well be that a racially oriented hiring system is more inconsistent with federal equal rights law than is the civil service system of hiring on the basis of merit." Thus, we can only conclude that the District Court, by this observation and its remand order, was of the view that the instant case should be decided in terms of the provision of our Act of June 27, 1939 rather than federal constitutional and statutory considerations.

Second: The appellees claim that a number of federal courts have upheld the right of minorities to preference in employment under affirmative action programs and cite the following cases to support this position: *United States v. Elevator Constructors Local 5*, 538 F.2d 1012 (3d Cir. 1976); *Erie Human Relations Commission v. Tullio*, 493 F.2d 371 (3d Cir. 1974); *Pennsylvania v. O'Neill*, 473 F.2d 1029 (3d Cir. 1973) (en banc); *NAACP v. Allen*, 493 F.2d 614 (5th Cir. 1974); *Castro v. Beecher*, 459 F.2d 725 (1st Cir.

1972); *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. 1971) (en banc), *cert. denied*, 406 U.S. 950 (1972). Our reading of those cases discloses a common thread which includes one or more of the following aspects recognized in *NAACP v. Allen, supra*: (1) clear evidence of a long history of intentional racial discrimination, (2) a paucity, if not a total absence of any positive efforts by the employer to recruit minority personnel, and (3) utilization of unvalidated employment criteria and selection procedures and other discriminatory practices. On this record, as we have noted, no claim is made of the utilization of unvalidated examinations or of a rating procedure that was not job related or was discriminatory. Likewise, there is abundance of evidence of the positive efforts made by the employer to recruit minority persons to participate in the examinations. Also, the record does not reveal a long history of intentional racial discrimination, and the 1974 decision in *Glickman* only determined a prima facie showing of de facto discrimination resulting from the use of an unacceptable written examination. This testing impediment was promptly overcome by discontinuance of the test. Consequently, based on the record before us, the authorities cited by the appellees in support of the right of minorities to preference in employment are not persuasive.[5]

---

[5] Although the trial court did not cite or rely upon *Pennsylvania v. Flaherty*, 404 F. Supp. 1022 (W.D. Pa. 1975), the appellees do advance this case as support for the order appealed from here. *Flaherty* was filed in the federal court to redress alleged discriminatory employment practices in the hiring of Pittsburgh city police officers. The *Flaherty* court issued a preliminary injunction imposing, as an interim measure, a minority hiring quota on the immediate appointment of new police officers of the City of Pittsburgh. We note that *Flaherty* is distinguishable from the instant appeal in the following areas: (1) The quota imposed was by the court, after hearing, rather than by unilateral decision of the employer; (2) although equally desirable, the correction of the racial imbalance in a police force is more urgent than in a fire bureau; (3) the exam-

We must conclude that reverse discrimination designed to grant a preference to a minority employee is as objectionable and unconstitutional when the preference is voluntarily initiated by the employer as it would be if compelled by a court. The victim of racial discrimination resulting from such reverse-discrimination policies will not be able to discern a different consequence in either case. Further, we would agree with the holding in *Reeves v. Eaves,* 411 F. Supp. 531 (N.D. Ga. 1976), that if any preferential or discriminatory action is necessary to overcome the effects of any prior discrimination, it must come by court decree and not by a subjective, individualized selection process by the employer where there is no opportunity objectively to ascertain its necessity. Therefore, although we do not believe this record supports any justification for the use of quotas to provide preference in employment to minorities, if such affirmative action were necessary, it would appear to follow that such action would need be by court direction rather than by employer whim. Preferential treatment under the guise of affirmative action is the imposition of one form of racial discrimination in place of another. *Anderson v. San Francisco Unified School District,* 357 F. Supp. 248 (N.D. Cal. 1972).

Order reversed.

ORDER

Now, this 15th day of July, 1977, the Order of the Court of Common Pleas of Allegheny County under date of June 4, 1976, denying plaintiffs-appellants' motion for preliminary and permanent injunction is hereby reversed, and the Pittsburgh Civil Service Com-

---

ination in the instant case has not been challenged as being discriminatory or, as in *Flaherty,* found to be so; and (4) this is not a case dealing with the civil rights of members of a minority but rather with the civil rights of members of a majority under the provisions of a racially neutral civil service act.

mission is hereby ordered to certify the names of John S. Chmill, David Hirosky, John G. Holtz, Thomas Pflum, David J. Puciata, Lawrence T. Yakich and Paul R. Myers to the City of Pittsburgh as persons eligible for purposes of appointment and hiring, relative to existing openings or hereafter occurring openings, for the position of firefighter in the City of Pittsburgh.

---

DISSENTING OPINION BY JUDGE WILKINSON, JR.:

I must respectfully dissent. I cannot agree that a properly motivated affirmative action program, call it reverse discrimination if you will, is objectionable or unconstitutional whether done voluntarily or by court order. Nor can I agree that an individual or commission cannot do voluntarily what can be ordered by a court to be done because it was not done voluntarily.

There is no need to set forth at length the history of the causes and effects of segregation and the legal basis for affirmative action programs to correct it. This has been done very currently and very ably by the lone dissenting judge in *Lige v. Town of Montclair*, 72 N.J. 5, 367 A.2d 833 (1976) and in *Bakke v. Regents of University of California*, 18 Cal. 3rd 34, 553 P.2d 1152 (1976), *cert. granted*, U.S. , 51 L. Ed. 2d 535 (1977).

It is most important to keep in mind always that, in my opinion, a properly motivated and administered affirmative action program only gives a preference to a member of a minority group after it is determined that an insufficient number have been admitted or employed and that he or she is qualified to do satisfactory work, either as a student or an employee. I would not consider the decision of this Court in this case of such great consequence if it had been based solely on the Act of June 27, 1939, P.L. 1207, *as amended*, 53 P.S. §23491 et seq., which set up the civil ser-

vice system for firemen in second class cities. I agree with the lower court that this act is modified by the later Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §951 et seq., and its amendments. However, the majority opinion is far more sweeping than that. If affirmative action programs are not authorized by the Pennsylvania Human Relations Act and are in fact contrary to it and the constitution, how then has the Pennsylvania Supreme Court and this Court ordered assignments of pupils to schools to correct de facto segregation? At the same time, consideration of color for pupil assignment which creates segregation is obviously illegal under the Pennsylvania Human Relations Act and unconstitutional. It is the motivation of the action which justifies the distinction between one and the other, as it does in so many other areas of the law. It is as incongruous to me to refer to giving a preference by race to qualified candidates who would not make it in competition on their own as being derogatory and patronizing to the intended beneficiary minority, as to say it would be derogatory and patronizing to throw a life preserver to a drowning man who is swimming against the current and could not make it alone.

Judge ROGERS joins in this dissent.