Pittsburgh Press Company, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Respondent.

Argued March 9, 1977, before President Judge
Bowman and Judges Crumlish, Jr., Kramer, Wilkin-
son, Jr., Mencer, Rogers and Blatt.

*Robert H. Shoop, Jr.,* with him *Thorp, Reed &
Armstrong,* for appellant.

*Elisabeth S. Shuster,* Assistant General Counsel,
with her *Sanford Kahn,* General Counsel, for appellee.

Opinion by Judge Kramer, July 21, 1977:

This is an appeal by the Pittsburgh Press Company
(the Press) from an order of the Pennsylvania Hu-
man Relations Commission (the Commission) order-
ing the Press to cease and desist the publication of

"Situation-Wanted" advertisements the contents of which are prohibited by Section 5(g) of the Pennsylvania Human Relations Act (Act),[1] in that those contents specify or in some manner express the race, color, religious creed, ancestry, age, sex or national origin of the person placing the advertisement.

The facts in this case are quite simple. The Press prints a "Situations-Wanted" classification in its classified advertisement pages as a service to its readers. Advertising space is, of course, paid for by the advertisers. Situation-wanted advertisements provide a means by which persons seeking employment may communicate their qualifications and job aspirations to the employing public at large. Usually, such an advertisement consists of a brief description of the jobseeker and the type of job he or she desires. The Press publishes these advertisements exactly as they are submitted. Beyond listing the ads alphabetically, the Press in no way alters any ad nor attempts to classify them further than by the simple "Situations-Wanted" classification.

Section 5 of the Act provides, *inter alia*:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employ-

[1] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §955(g).

ment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required.

. . . .

(e)   For any person, whether or not an employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be unlawful discriminatory practice.

. . . .

(g)   For any individual seeking employment to publish or cause to be published any advertisement which specifies or in any manner expresses his race, color, religious creed, ancestry, age, sex or national origin, or in any manner expresses a limitation or preference as to race, color, religious creed, ancestry, age, sex or national origin of any prospective employer.

On March 11, 1975, the Commission initiated a complaint charging the Press with violating Section 5(e)[2] of the Act by having aided and abetted the doing of an unlawful discriminatory act prohibited by Section 5(g).

After attempts at conciliation failed, a public hearing was held by the Commission on August 6, 1975, which resulted in a unanimous recommendation by the Hearing Panel that the full Commission find in favor

---

[2] 43 P.S. §955(e).

of the complainant. The cease and desist order was subsequently issued by the Commission.

An indication of the type of advertisement found by the Commission to violate Section 5(g) can be ascertained from the specific examples set forth in the Hearing Panel's findings of fact. These examples were drawn from stipulated exhibits which included the Press' "Situation-Wanted" columns from Sunday, June 1, 1975 to Thursday, June 26, 1975:

> COLLEGE GRAD—Born again Christian with Bachelor's Degree and seven yrs. sales and marketing mgmt. experience seeking work with Christian business or organization. . . .[3]

> White woman—desires day work, office cleaning.[4]

> Parolee—White needs employment to be released. Licensed steam boiler and engineer. . . .[5]

> Salesman—Age 30, looking for career in Pittsburgh, start immediately, 15 years sales experience. . . .[6]

> What can I do for you? Recent college grad, good looking, twenty-five years old, B.S. in Business Administration, seeks entry level management position.[7]

> Man—mature, accounting, bookkeeping, office management, desires position in these or related fields.[8]

---

[3] Exhibit A-1 (Rec. 27a).

[4] Exhibit A-1 (Rec. 27a).

[5] Exhibit A-1 (Rec. 27a).

[6] Exhibit A-1 (Rec. 27a).

[7] Exhibit A-8 (Rec. 34a).

[8] Exhibit A-23 (Rec. 48a). Due to the misplacement of an exhibit in the original stipulation of facts which was corrected in the appellant's printed record, the designation of the exhibits from A-15

It is obvious at a glance that the contents of these advertisements are in contravention of the letter of Section 5(g).[9] The Press does not contend otherwise. It does, however, challenge the constitutional validity of Section 5(g) on the basis of the First and Fourteenth Amendments to the United States Constitution.[10]

Initially, the Commission raises the question of the Press' standing to challenge Section 5(g). We are certain that the Press does have standing to challenge that Section of the Act. The order entered against the Press was the result of the Commission's determination that the Press had aided and abetted the violation of Section 5(g). In the words of the Court in

---

to the end of the "A" exhibits, does not coincide in the two records. For example, "A-23" in the original record will appear as "A-22" on page 48a of the printed record. The exhibit references herein are from the original record, but the page in the printed record is also included.

[9] The Court has analyzed the contents of the Press' situation-wanted ads for June 1, 1975 to June 26, 1975 in terms of the prohibitions in Section 5(g). The figures arrived at are less than exact, because many references, especially as to age, are quite subtle, if they are intentional at all.

Of a total of 845 ads, 307 indicated in some manner the sex of the advertiser. Approximately 55.7 percent of these were males, while 44.3 percent were females. There were 82 ads which gave some indication of age. Some of these were explicit. Many were in terms of "young" or "elderly," while a large number of ads conveyed the advertisers "maturity" in terms of a high figure for years of experience in their fields. Using the figure of 40 years as approximately halfway between entry into the job market and the normal retirement age, we find that 47 of the ads conveyed the impression of "youth" while 35 of the ads expressed the "maturity" of the advertiser. This is approximately a 57.3 percent to 42.7 percent breakdown. There were only four references to race; all to the "white" race. There was one ad which referred to religion, and there were no references to national origin or ancestry.

[10] The First Amendment is applicable to the States via the Fourteenth Amendment. *Schneider v. State*, 308 U.S. 147, 160 (1939).

*Griswold v. Connecticut,* 381 U.S. 479, 481 (1965), "Certainly the accessory should have the standing to assert that the offense which he is charged with assisting is not, or cannot constitutionally be, a crime." The same logic is applicable here to confer standing on the Press to challenge Section 5(g).[11]

The Press asserts that its advertisers have the right to submit for publication, and the Press has the right to publish, situations-wanted advertisements the contents of which are offensive to Section 5(g), and that the proscription of Section 5(g) unconstitutionally infringes on those rights in derogation of the First Amendment. The Commission answers first with the contention that these ads propose "purely commercial transactions" and thus do not come within the protec tion of the First Amendment.

The doctrine that speech is unprotected per se if it is purely commercial in nature was first propounded in *Valentine v. Chrestensen,* 316 U.S. 52 (1942). Any vitality remaining in that doctrine after the decision in *Bigelow v. Virginia* (hereinafter *Bigelow*),

---

[11] This is particularly true in this case, where the Commission chose not to press its complaint against any of the advertisers, but only against the Press. To accept the Commission's standing argument would be to allow the Commission to forever avoid review of Section 5(g) by simply never commencing proceedings against anyone directly pursuant to Section 5(g).

Moreover, we note that the Press is not merely raising the rights of third persons in its attack on 5(g). From past litigation, the Press has learned that a First Amendment attack on a citation for aiding and abetting may not prevail if the provision creating the underlying substantive offense is left unchallenged. *See Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376 (1973). While the aiding and abetting provision may be perfectly valid, the underlying provision alleged to be violated may not be so, in which case the Press must challenge the latter provision in order to vindicate its own constitutional rights.

421 U.S. 809 (1975), was completely extinguished in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S. Ct. 1817 (1976) (hereinafter *Virginia Pharmacy*). In *Virginia Pharmacy* the Court stated:

> Our question is whether speech which does 'no more than propose a commercial transaction' . . . is so removed from any 'exposition of ideas' . . . and from 'truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government' . . . that it lacks all protection. Our answer is that it is not.

425 U.S. at 762, 96 S. Ct. at 1826.

The Court recognized that the basic need for the free flow of commercial information for the proper functioning of a free market economy "suggests that no line between publicly 'interesting' or 'important' commercial advertising and the opposite kind could ever be drawn." 425 U.S. at 765, 96 S. Ct. at 1827.[12] The conclusion that purely commercial speech is not unprotected per se has been emphatically reaffirmed by the Court in *Linmark Associates, Inc. v. Township of Willingboro* (hereinafter *Linmark*), U.S. , 45 U.S.L.W. 4441 (May 2, 1977), where an ordinance banning "For Sale" and "Sold" signs for the purpose of stemming "panic selling" and "white flight" from the community was held unconstitutional under *Virginia Pharmacy*.

---

[12] *Bigelow v. Virginia, supra*, which involved advertising of the availability of abortions, did contain indications that an advertisement must have some special societal or political importance in order to be protected speech. The statement quoted in the text makes it clear that the Court now eschews such a limitation. Advertising per se is now recognized to be of sufficient importance to our society to merit some First Amendment protection.

Although it is thus clear that situation-wanted advertisements are not *unprotected per se,* it remains to be decided whether the contents of such an ad which run afoul of Section 5(g) may be constitutionally suppressed. The Court in *Virginia Pharmacy* recognized that commercial speech is not immune from regulation, 425 U.S. at 770, 96 S. St. at 1830, and may require less protection than other varieties of speech in order to insure an unimpaired "flow of truthful and legitimate commercial information." 425 U.S. at 771-72 n. 24, 96 S. Ct. at 1830 n. 24.

In attempting to show that the cease and desist order in this case is pursuant to such a valid regulation of commercial speech, the Commission relies upon the decision in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations* (hereinafter *Press I*), 413 U.S. 376 (1973). In *Press I,* the Court upheld an order directing the Press to cease and desist the publication of *help-wanted* advertisements under sex-based classification headings. In particular the Commission relies on the Court's statement that—

> Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.

*Press I* at 389.

Later cases have also alluded to the validity of advertising restrictions related to the illegality of the transaction proposed by the advertisement. *Virginia Pharmacy* at 771, 96 S.Ct. at 1825; *Bigelow* at 821. However, not since *Press I* has the Court actually dealt with a case involving a ban on commercial speech "incidental" to an underlying valid limitation on eco-

nomic activity or the prevention of an illegal transaction.[13]

There is no doubt that the underlying commercial activity sought to be banned by Section 5(a) is illegal. The Press in no way challenges the Section 5(a) prohibition of discrimination in employment on the basis of race, color, religious creed, ancestry, age, sex or national origin. The quote from *Press I* would indicate that we then need only to determine whether the advertising restrictions of Section 5(g) are "incidental" to that prohibition. If it is, then 5(g) would be valid and any need for balancing obviated. The posture of *Press I* and the decisions in later cases convince us, however, that this is no longer the appropriate "test."

*Press I* must be read in light of the fact that the Press did not there challenge the section of the Pittsburgh Ordinance which prohibited the indicating of sex discrimination in advertising by employers, employment agencies, and labor unions. The Press challenged only that section of the ordinance which made it unlawful for any person to aid in the doing of any act declared to be an unlawful employment practice by the ordinance. Because the Press conceded the illegality of not only sex discrimination in employment but also the advertising of same, and because the facts

---

[13] In *Linmark* and *Virginia Pharmacy* the advertising restrictions were related to the States' general interest in integrated housing and professional standards of pharmacists, respectively, but they were not incidental to any specific regulation in those areas. The restrictions were enacted to further the States' interests *in and of themselves*, and not as *ancillary* to a specific underlying regulation. In *Bigelow*, although abortion was illegal in Virginia, it was not illegal in New York at the time. Naturally, Virginia was without power to regulate abortions in another state, so a ban on the advertising of abortion availability in New York could not be characterized as *incidental* to a *valid* limitation on, or regulation of, abortions.

in *Press I* revealed that the Press was clearly aiding in the propagation of such advertising, the Court was not compelled to formulate any refined "test" for the validity of speech restrictions related to activities which the government may legitimately regulate or prohibit. The word "incidental" was a sufficient description of the relationship under the circumstances of *Press I*.

Two years after *Press I,* the Court decided the Bigelow case. Although it was eventually determined that the prohibition of advertising the availability of abortions did not relate in any way to a *valid* underlying regulation of conduct under the particular facts of that case,[14] the *Bigelow* case did prompt the Court to reformulate its "test" or standard of review for this type of commercial speech case. The Court stated:

> To the extent that commercial activity is subject to regulation, the relationship of speech to that activity may be one factor, among others, to be considered in weighing the First Amendment interest against the governmental interest alleged.

*Bigelow* at 826.

We believe that a balancing analysis is the appropriate standard of review for the present case. The factors to be weighed are the opposing First Amendment and governmental interests, the effectiveness of the speech restriction in promoting the underlying valid regulation, and the extent of any incidental restrictions on legitimate forms of commercial speech.[15]

---

[14] *See* note 13, *supra.*

[15] As indicated by note 13, *supra,* there appear to be two basic types of commercial speech content regulation. The first type is intended to further the government's interest in an area in and of itself, such as the price advertising ban in *Virginia Pharmacy* or the ban on "Sold" and "For Sale" signs in *Linmark.* The second type is intended to be *ancillary* to, or serve as the natural adjunct

The Commonwealth's asserted interest in the prevention of employment discrimination based on race, color, religious creed, ancestry, age, sex or national origin is certainly a substantial one. Pitted against it is the job-seeker's interest in being able to fully, yet truthfully,[16] utilize the press to "advertise" himself or herself in that manner and by such terms as he or she believes will be most efficacious in producing the de-

---

of, a specific and direct regulation of some activity, as in *Press I* and the present case. We perceive somewhat different standards of review for each type of regulation.

A reading of *Bigelow* reveals that the Court's approach, at that time, was to determine by balancing whether any individual advertisement was protected by the First Amendment. Advertising was not unprotected per se, but there was a "rebuttable presumption" of no protection. *Virginia Pharmacy* reversed this "presumption" by concluding that commercial speech *in general* was, protected. The Court did, however, also conduct a balancing of the factors in the specific case before it, indicating that balancing survived as a means of determining exceptions to the new blanket protection for commercial speech. Finally, in *Linmark* the Court paraphrased a line from *Virginia Pharmacy* and simply held the ordinance involved to be unconstitutional because it "impaired 'the flow of truthful and legitimate commercial information.'" 45 U.S.L.W. at 4445. This "test" was easy to apply in *Linmark* because truthful information will be legitimate if the activity or transaction which is the subject of the commercial speech is not prohibited or limited by valid regulation. However, where a speech restriction is ancillary to a specific prohibition or restriction of an activity, that underlying regulation may, in effect, deprive certain speech of its "legitimacy." A ban on the advertising of prostitution, where prostitution itself is illegal, is a clear example. Other cases, like the present one, are not so clear. There is no obvious and direct relationship between situation-wanted ads and discrimination by employers. It is in cases such as this that we believe a proper resolution requires a balancing analysis of the opposing interests, the effectiveness of the ban as ancillary to the underlying valid regulation, and the extent of incidental restrictions on legitimate commercial speech.

[16] The Commission has not alleged that any of the ads are false or misleading.

sired result. That this interest must not be minimized can be seen by looking at its component parts. As a pure matter of expression, there is the basic interest of the individual in being able to tell anyone who will listen just who and what that individual is: to be able to say "I am black" as well as "I am a college graduate" or " I am male" as well as "I am ambitious." The purpose for such expression provides, in the present case, an additional element of import. The Supreme Court long ago recognized the great magnitude of the individual's interest in obtaining employment and earning a living. *Truax v. Raich,* 239 U.S. 33 (1915).[17] Here we are not dealing with the ordinary transaction between a "seller hawking his wares and a buyer seeking to strike a bargain." *Virginia Pharmacy* at 425 U.S. 781, 96 S.Ct. at 1835 (REHNQUIST, J., dissenting). We are dealing with the efforts of individuals to sell the only thing that they have to offer: their labor. For the users of the situation wanted column, often the least skilled and most desperate job-seekers, the quest for employment may cause the liveliest political or social controversy of the day to shrink to insignificance by comparison.[18]

We now come to the question of the relationship of the speech involved here to the commercial activity

[17] "[T]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." 239 U.S. at 41.

[18] The recognized qualitative and quantitative difference in the interest of the job-seeker as opposed to the interest of an employer involved in the hiring of employees serves as one way to distinguish this case from one involving a challenge to a ban on the advertising of discriminatory hiring by an employer. The filling of job vacancies in the usual course of business surely must be accorded a lesser weight in a balancing analysis than an individual's interest in obtaining a job. The former is a routine matter of business practice, while the latter is usually one of economic survival.

subject to regulation. *Bigelow* at 826. The Act does not prohibit individuals from accepting or rejecting jobs on the basis of one of the "forbidden criteria." Thus, the relationship which we must focus upon is the relationship of the speech involved here to illegal discrimination by *employers*. Stated another way, we must assess the extent to which Section 5(g) promotes the fulfillment of the purpose of Section 5(a).

The Commission asserts that permitting job-seekers to specify their race or sex, for example, will provide the prejudiced employer with an easy means to perpetrate discriminatory hiring. We do not believe that such an advertisement provides an employer so disposed with any easier or better tool for discrimination than does a resume or job interview.[19] Here, we must distinguish *Press I*. In *Press I,* the advertisers and the Press were classifying *jobs* on the basis of sex. Discriminatory hiring was facilitated because persons of one gender were *discouraged* from even *applying* for a job that was advertised as being of "interest" only to persons of the opposite gender. As the Court stated in *Press I* at 387, "By implication, at least, an advertiser whose want ad appears in the 'Jobs—Male Interest' column is likely to discriminate against women in his hiring decisions." Moreover, the positive relationship between the advertisements in *Press I* and

---

[19] We note that the Commission's argument is unsupported by the record itself in the sense that one would expect a much higher number and proportion of references to characteristics preferred by the prejudiced employer if the situation-wanted column had become an avenue for "easy" discrimination. Yet, no particular group characterized by any of these traits dominates the column. The numerically frequent references to age and sex are fairly evenly divided between age groups and genders. References to race, religion, and national origin rarely appeared, if at all. *See* note 9, *supra.* While these figures cannot prove that discrimination does not occur as a result of the ads, it is likewise true that they do not support a conclusion that it does occur.

sex discrimination in employment was reflected in the record. *Press I* at 381 n.7. In the present case, we are dealing with *individuals who choose to classify themselves* according to race, sex, or one of the other traits. There is no evidence in the record that ads of the type found objectionable by the Commission result in employment discrimination, nor do such ads imply, as did those in *Press I,* that any employer is likely to discriminate in hiring. Section 5(g) does not directly affect hiring practices one way or another. It affects them only through the reactions it is assumed employers will have to the free flow of information. *See Virginia Pharmacy* at 425 U.S. 755, 96 S.Ct. at 1820. And we believe, moreover, that the Commission's assumptions as to employer reactions are narrowly one-sided and thereby fail to draw attention to the impact of Section 5(g) on other, legitimate aspects or uses of the commercial speech involved here.

The Commission apparently assumes that only the prejudiced employer will react to or affirmatively utilize the "objectionable" characteristic information in these ads. This overlooks the possibility that a fair-minded employer may react in the negative to any ad that specifies any race, sex, religion, age or national origin. Such an employer may seek to avoid hiring individuals who are themselves prejudiced. More importantly, the Commission overlooks a quite legitimate use of this type of characteristic information. "Equal Opportunity" and "Affirmative Action" employers may use the information in such ads to find more minority applicants to interview for a position.[20] Even

---

[20] We specifically confine this statement to recruiting minorities for interviews or consideration for a job, and thus need not discuss the issue of the validity of "reverse discrimination." As to that issue, *see Chmill v. City of Pittsburgh,* 31 Pa. Commonwealth Ct. 98, 375 A.2d 841 (1977).

an ad which boldly "specifies" such information has this legitimate use.

Moreover, Section 5(g) impedes the flow of greater amounts of legitimate commercial information by banning ads which "in any manner" express any of the "forbidden" characteristics. A job-seeker's name is, beyond doubt, a completely legitimate item of information in a situation-wanted ad. Yet Section 5(g) is obviously offended in one or more respects by, just as examples: Svenson, Weinstein, Tanaka, Kowalski, Garcia, O'Brien, or Schmidt. Most given names, such as Dennis[21] and Joyce,[22] leave little more doubt as to gender than do the titles "Mr.," "Mrs.,"[23] and even "Ms."

Section 5(g) would also suppress vital information relating to job qualifications. A person's alma mater, be it high school or college level, can inform an employer of the quality of education a job-seeker has had. Yet 5(g) would prohibit the inclusion in an ad of "North Catholic High School" or "Oral Roberts University." For indicating race, "Morgan State" or "Grambling" would offend 5(g). The graduate of the all-female Carlow College would likewise transgress 5(g) by advertising that fact. Another important job qualification is experience. However, one with as very much experience as 30[24] or 55[25] years may find that this excellent qualification cannot be advertised because it also expresses a good indication of relative age. The baby-sitter who describes herself as an "experienced mother,"[26] perhaps a very persuasive qualification to many with young children, clearly violates

---

[21] Exhibit A-13 (Rec. 39a).

[22] Exhibit A-20 (Rec. 45a).

[23] Exhibit A-17 (Rec. 42a).

[24] Exhibit A-14 (Rec. 40a).

[25] Exhibit A-14 (Rec. 40a).

[26] Exhibit A-9 (Rec. 35a).

5(g). Finally, 5(g) would require the "Salesman,"[27] "Body man,"[28] "Handyman,"[29] and "Cleaning Lady"[30] to find some other way to denote their chosen occupation without connoting gender. While it may very well be completely valid to require an employer-advertiser to substitute "-person" as the suffix of these words when used to describe a job, to compel an individual to describe himself or herself in such stilted and sterile language, or forgo speaking at all, smacks of the imposed linguistic conformity of an Orwellian nightmare.

The result of our balancing analysis should, at this point, be clear. We conclude that the Commission has failed to show that Section 5(g) in any way significantly furthers the Commonwealth's concededly substantial interest in eradicating employment discrimination. We also conclude, on the other hand, that application of Section 5(g) would have the effect of significantly impairing the flow of legitimate and truthful commercial information. In view of these conclusions, it is clear that the balance in this case must be tipped in the favor of the First Amendment interest of the advertisers and against the constitutional validity of the challenged portion of Section 5(g).[31] We hold, therefore, that the Commission is without power to prohibit the inclusion in any situa-

---

[27] Exhibit A-9 (Rec. 35a).

[28] Exhibit A-10 (Rec. 36a).

[29] Exhibit A-1 (Rec. 27a).

[30] Exhibit A-18 (Rec. 43a).

[31] The Commission charged the Press only with aiding the publication of advertisements which specify or express the "prohibited" characteristics of the *job-seeker*. That portion of 5(g) which prohibits the job-seeker from expressing in the ad any limitation or preference as to the race, color, religious creed, ancestry, age, sex, or national origin of the prospective *employer* is not presently before us, and, therefore, is not invalidated or directly affected by today's decision.

tion-wanted advertisement of any specification or expression of the advertiser's race, color, religious creed, ancestry, age, sex or national origin. As a natural consequence, we further hold that the cease and desist order entered against the Press for aiding and abetting the publication of such situation-wanted advertisements is constitutionally invalid. We therefore reverse.

## ORDER

AND Now, this 21st day of July, 1977, the Order of the Pennsylvania Human Relations Commission, Docket No. E-8528, dated June 27, 1975, is hereby reversed.