DETROIT POLICE OFFICERS' ASSOCIATION et al., Plaintiffs-Appellees,

v.

Coleman A. YOUNG, Mayor of the City of Detroit, et al., Defendants-Appellants.

No. 78–1163.

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1979.

Decided Oct. 12, 1979.

676

Barry L. Goldstein, Washington, D.C., James R. Andary, Hall & Andary, Detroit, Mich., Lowell Johnston, Jack Greenberg, Patrick O. Patterson, O. Peter Sherwood, New York City, Roger E. Craig, Anna Diggs-Taylor, Detroit, Mich., Kathleen McCree Lewis, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendants-appellants.

Walter S. Nussbaum, Southfield, Mich., John F. Brady, Detroit, Mich., Donald J. Mooney, Jr., Paxton & Seasongood, Cincinnati, Ohio, for Detroit Police Officers' Ass'n.

Thomas H. Oehmke, New Detroit, Inc., Detroit, Mich., Robert A. Sedler, Wayne State University Law School, Detroit, Mich., for amicus curiae, New Detroit, Inc.

Stephen C. Washington, Dorothy Smith, Detroit, Mich., for amicus curiae, Michigan Coalition to Overturn Bakke Decision (MCOBD).

Marcia Cooke, Center for Urban Law, Detroit, Mich., for amicus curiae Wayne County Neighborhood Legal Services.

Jeanne Mirer, Detroit, Mich., National Lawyers Guild, for National Lawyers Guild (NLG).

Robert J. Reinstein, Abner W. Sibal, Gen. Counsel, Drew S. Days, III, Asst. Atty. Gen., Brian K. Landsberg, John C. Hammock, Equal Employment Opportunity Commission, Dept. of Justice, Washington, D. C., for amicus curiae, United States and Equal Employment Opportunity Commission.

Warren J. Bennia, New York City, for amicus curiae, Guardians of Michigan.

John A. Fillion, Gen. Counsel, Jordan Rossen, Edwin G. Fabré, Detroit, Mich., for amicus curiae, International Union, UAW.

Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Paul J. Spiegelman, Sp. Asst. Atty. Gen., Lansing, Mich., for amicus curiae, State of Michigan and Civil Rights Commission.

Henry Bernard Clay, III, Robert Hill, Lander C. McLoyd, Detroit, Mich., for amicus curiae, National Conference of Black Lawyers.

Ralph R. Smith, Germaine Ingram, Philadelphia, Pa., for amicus curiae, Citizens for Affirmative Action in Detroit (CAADET).

Ernest Goodman, Paul A. Rosen, Cooperating Atty. for the ACLU of Metropolitan Detroit, Detroit, Mich., Bette J. Huster, Richard T. Parker, Detroit, Mich., for amicus curiae, American Civil Liberties Union of Metropolitan Detroit.

Reuben A. Munday, Lewis, White, Clay & Graves, Detroit, Mich., for amicus curiae, Detroit Urban League.

Doug Korney, Detroit, Mich., for amicus curiae, Police Officers Association of Michigan.

John E. Jacobs, Richard P. Saslow, Butzel, Fruhauf, Keidan, Simon, Myers & Graham, Detroit, Mich., Arnold Forster, Jeffrey Sinensky, Richard A. Weisz, New York City, for amicus curiae, Anti-Defamation League of B'Nai B'rith.

John A. Lyons, Troy, Mich., Bruce T. Leitman, Bloomfield Hills, Mich., for amicus curiae, Fraternal Order of Police State Lodge.

Myron Domsky, Patchogue, N. Y., for amicus curiae, International Conference of Police Association.

John Findley, Ronald A. Zumbrun, Sandra R. Johnson, Sacramento, Cal., for amicus curiae, Pacific Legal Foundation.

Arthur J. Harvey, Albany, N. Y., for amicus curiae, Police Conference of New York, Inc.

John Ruckelshaus, Rex Killian, Indianapolis, Ind., for amicus curiae, Fraternal Order of Police National Lodge.

John J. Maguire, Hartman & Lerner, New York City, for amicus curiae, Patrolmen Benevolent Association of New York, Inc.

Richard P. Saslow, Detroit, Mich., for amicus curiae, Committee on Academic Non-Discrimination and Integrity.

Before CELEBREZZE, LIVELY and MERRITT, Circuit Judges.

LIVELY, Circuit Judge.

This appeal is from a judgment of the district court which permanently enjoined the defendants from continuing the operation of an affirmative action program by the Detroit Police Department. The plaintiffs are an association of police officers and a number of white Detroit policemen who were passed over for promotion to the rank of sergeant when black officers with lower numerical standings on the eligibility list received promotions. The district court found that the affirmative action program offended the equal protection clause of the Fourteenth Amendment and violated 42 U.S.C. § 1981, Section 601 et seq. (Title VI) of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (1976), and Section 703(a) and (j) (Title VII) of the 1964 Act, 42 U.S.C. § 2000e–2(a) and (j) (1976).[1] The memorandum opinion of the district court appears at 446 F.Supp. 979 (E.D.Mich.1978). All defendants have appealed.

## I.

It is undisputed that in 1968 the total black component of the Detroit police force was between four and five percent. The percentage of black sergeants and higher ranking officers was even less.[2] In the wake of tragic civil disturbances in Detroit in July 1967 the community's attention turned to improving race relations in Detroit.

---

1. 42 U.S.C.:

§ 1981.

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

§ 2000d.

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

§ 2000e–2.

(a)

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

. . . . .

(j)

Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area.

2. In 1950, one percent of Detroit policemen were black, while 16 percent of the city's population was black. In 1960, two percent of police were black, while 29 percent of the city was black.

Widespread alienation of black residents from the Detroit Police Department was one problem identified by city leaders. Two groups, a Mayor's task force and a police advisory group, were formed to recommend changes in personnel policies which could contribute to the solution of this problem. The advisory group, the "Vickery Committee," was composed of personnel administrators and psychologists from private industry. Believing that "any incident involving the police might serve to incite a civil disturbance of the kind experienced in July, 1967," the Vickery Committee recommended to the Department the abandonment of certain qualifications for police employment it found "non-relevant to the actual requirements" of police work.

The Department's liaison with the Committee was Richard Caretti, who was assigned to the personnel section in September 1968. Caretti, who held the position of Deputy Director of Personnel and the rank of Commander at the time of trial, testified extensively. Though never trained as a psychologist, Caretti had both undergraduate and master's degrees in business administration with emphasis on police administration. Prior to his assignment to personnel work Commander Caretti had more than 15 years experience as a member of the Detroit police force, primarily as a precinct officer and detective.

Caretti testified that immediately after his assignment to the personnel section he became involved in a series of adjustments in the recruiting and hiring practices of the police department. These adjustments, which continued from 1968 through 1973, were intended to improve the ability of black candidates to negotiate the selection process successfully and make the selection procedure more accurately reflect the skills needed for the job of police officer.

For example, one of the early adjustments was the replacement of a 3½ hour written entry level examination with a 12-minute test considered equally effective. This was an interim step recommended by the Vickery Committee. However, both the longer and shorter exams were essentially I.Q. tests which Caretti concluded did not properly measure the skills required of a police officer. He also felt that these tests incorporated cultural biases to the disadvantage of black applicants. The Department later abandoned the I.Q. tests altogether and in 1973 adopted a new test and a "differential regression curve" to grade it. The purpose of the scoring curve was to compensate for bias inherent in such tests by providing different formulae for determining the pass/fail point for white and black applicants.

Efforts to attract additional black candidates were also instituted. Physical requirements for employment, such as blood pressure standards, were changed because they were believed to exclude black candidates and yet had little value in determining physical suitability. Procedures for conducting background investigations of applicants were altered because they created opportunities for racial discrimination in the entry level screening process.

During the same period efforts were made to devise a "promotional model" for promotion from patrolman to sergeant that would be free of bias. The term "promotional model" refers to a total package of factors considered when a candidate stands for promotion. The most heavily weighted ingredient of the promotional model is a written examination. In 1968 the written promotion exam, like the entry level test, was essentially an intelligence test which principally gauged verbal ability.

Between 1968 and 1973 the Department adopted several different tests for promotions before one was specifically devised for it. Commander Caretti testified that the written examination used for promotion to sergeant in 1973, 1974 and 1976 was the "Furcon" exam which, like the 1973 entry exam, was developed at the University of Chicago. The witness stated that despite all efforts to eliminate bias the written promotional exams retained an adverse impact on black candidates. The examination for promotion to sergeant which was given in December 1973 produced a 72% failure rate among black candidates and a 57%

failure rate among white candidates. For the November 1974 examination the black failure rate was 61%; that of the white candidates was 47%. The May 1976 failure rate was 58% for black and 47% for white candidates.

In addition to grades on written examinations the "promotional model" required consideration of other factors: recent performance ratings by superiors, seniority, college credits and veterans' points. During the period under consideration performance at an oral interview was added as a factor. The result of the process was a score which was a composite of grades of all the elements, each element weighted by a predetermined percentage applied to the raw score. An eligibility list was drawn up with a sufficient number of names to fill the projected vacancies. Only candidates who received a raw score of 70 or better on the written exam were listed on the roster. Candidates were listed in rank order according to their weighted composite scores.

The percentages or weights assigned to the various factors were adjusted from time to time. The weight given to the written test was reduced when the oral boards were instituted and, similarly, the percentage of the total grade achievable by reason of seniority was reduced when that resulting from advanced education was increased. In 1973 the total length of service on the force required to take the written examination for promotion to sergeant was also reduced.

Prior to July 1974 all promotions to sergeant were made in strict numerical order from the eligibility list. However, a new city charter effective July 1, 1974 required the appointment of a Board of Police Commissioners (BPC) which was entrusted with the task of approving police promotions and establishing "policies, rules and regulations" for the police department. At its July 31 meeting the BPC adopted an affirmative action policy by a resolution which directed the Chief of Police, *inter alia*, to eliminate discriminatory hiring practices and to take affirmative action to promote minority candidates from existing promotion lists. The necessity for affirmative action was based on "past and present discrimination in the hiring and promotional policies of the Detroit Police Department . . .," according to the BPC resolution.

Prior to the adoption of the resolution but nearly six years after the Vickery Committee's report, Detroit had a black population of nearly 50 percent but a police force only 17 percent black. The Department adopted a 50/50 ratio as its goal for staffing at all levels. It was apparent that this goal could not be achieved in the rank of sergeant if the Department followed its past practice of adhering to the numerical order on the eligibility list. This practice had resulted in the advancement of 29 whites but only one black to the rank of sergeant in the round of promotions immediately prior to the institution of affirmative action.

By order of the Chief of Police the eligibility list assembled from the December 1973 sergeant examination was expanded by adding names of persons who had achieved passing grades, but whose composite scores were lower than that of the person whose name stood last on the existing list. At the time the list was expanded all black candidates on the original roster had been promoted and expansion of the list created a new pool of black candidates. In the promotions which followed black male candidates were selected over some white males who stood higher on the eligibility list.[3] This "dipping" produced approximately equal numbers of new black and white male sergeants from the December 1973 list as expanded. The 50/50 ratio was observed in subsequent promotions following new examinations in November 1974 and May 1976. This was accomplished in each case by passing over white candidates with higher scores and promoting black candidates who stood lower on the roster. No candidate who failed to achieve the minimum exam score of 70 for listing on the eligibility roster was promoted.

---

**3.** In compliance with a court order in a separate action a number of female candidates were also promoted each time. *See Schaefer v. Tannian*, 394 F.Supp. 1128 (E.D.Mich.1974).

## II.

### THE DISTRICT COURT'S FINDINGS OF FACT

#### A. Discrimination Against White Officers

The district court made extensive findings of fact, many of which are attacked on appeal as clearly erroneous. In support of its conclusion that affirmative action discriminated against white officers, the court found, "There was, in actuality, two [promotion eligibility] lists, one for white males and one for black males." 446 F.Supp. at 987.

The district court further found that affirmative action promotions resulted in the advancement of less qualified persons, stating:

> The testimony consistently was, and this Court finds to be fact, that the higher a candidate stood on the eligibility register the better qualified and equipped he was to assume the position of Sergeant. The above mentioned witnesses testified, and the Court accepts as fact, that application of the model was intended to, and in fact did, demonstrate relative differences in potential job performance. Further, these witnesses testified, and this Court accepts as fact, that the candidates, positioned on the register were not, as defendants claimed, equally qualified or a "pool" of qualified candidates.[26]

[26] Defendants presented the Court with no evidence, other than bald assertions by Tannian, to support the claim that these candidates were "equally qualified".

446 F.Supp. at 994.

The finding of discrimination against white candidates for promotion was supported by the further finding that from December 1973 through 1976 the examination component of the promotional model conformed with standards promulgated by the Equal Employment Opportunity Commission and "measured relative differences of probable job success between candidates for promotion." *Id.* at 990. In addition, the court found that all of these written

exams for promotion to sergeant were job related and content valid.

#### B. Prior Discrimination Against Black Officers

The district court also made findings which were the basis of its rejection of defendants' claim that affirmative action was justified. The first rejected defense was the contention that prior racial discrimination by the Department warranted remedial affirmative action.

With respect to recent hiring, the district court found that use of the entry level exam beginning in 1973 resulted in random hiring rather than hiring the most qualified applicants. The court found that although the test was not job related, scoring it by use of differential regression equations resulted in hiring black and white applicants in approximately equal numbers. Use of this exam, scored in this way, was found to reflect the racial composition of the city rather than a concern with hiring those best suited to be patrolmen.

Considering the other elements of the "promotional model," the district court found that none was shown to have any disparate impact or to discriminate against black candidates in any way. He specifically found that there was no evidence which showed an intentional discrimination in use of the seniority factor; rather he found that "seniority equally affected blacks as well as whites and that if this factor discriminated it did so against the younger, less senior officers without regard to their race." 446 F.Supp. at 993.

However, the district court also found that, until 1973, the Department's entrance examinations failed a disproportionate number of black applicants. Even after the examination was changed in 1968 and again in 1971 to cure its exclusionary effects, the tests "continued to screen out greater numbers of blacks than whites." 446 F.Supp. at 999. The District Judge stated his conclusion in the following summary:

> . . . until 1973 entry level (hiring) written examinations of the Detroit Police Department may have constituted a source of discrimination against blacks

seeking entry into the department because these examinations were heavily weighted on I.Q. type questions, were not job related and tended to fail large numbers of blacks vis a vis whites. However, the evidence also shows that after installation of the Detroit Furcon exams in 1973, no discrimination of any form existed in regard to black applicants for positions as police officers.[60]

[60] At this point in time blacks and whites were passing the entry examinations at approximately the same rate.

446 F.Supp. at 1000.

The court made no findings regarding defendants' evidence of specific instances of discrimination in the conditions of employment, but concluded that no evidence of discriminatory failure to hire qualified applicants had been presented.

Defendants' statistical evidence of historical hiring discrimination was considered and rejected. The district court divided the data into two groups: the numbers of black and white persons hired from 1944 to 1968, and the numbers of black and white appointees and applicants from 1968 to 1975. It was found that the statistics presented by the defendants failed to show discrimination against black applicants for employment in either the distant or recent past. While noting that the Department had hired relatively small numbers of black officers between 1944 and 1968, the court found the data incomplete. No comparative census data or numbers of applications by race during these years were presented, and the court therefore concluded that these "naked numbers of black and white hired is [sic] susceptible to a multitude of conclusions." *Id.* at 998.

With respect to the years 1968–1975, when census data and the numbers of applications by race were available, the district court found other deficiencies which created a "lack of statistical verity." Therefore the court decided to accord "no weight" to statistical evidence which indicates on its face a "significant difference" in the success rate of black and white applicants. *Id.*

Past promotional practices were also found not to be discriminatory either in the composition of the promotional models or their application.

The district court made a statistical analysis which showed to its satisfaction that there was no underutilization of blacks by the Department. This analysis consisted of a comparison of the black proportion of the police force with the black proportion of the entire local labor market. The district court found that the bulk of all applicants for police positions came from a tri-county area (Wayne, Oakland and Macomb) in which the combined 1970 population possessing the minimum requirements for police employment was 18.6% black. Treating this as the relevant labor market, the district court found that a black component of 17.23% in the police department in 1974 did not represent a significant underutilization. The court flatly rejected use of the general population of the City of Detroit, which was about 44 percent black in 1970, as the relevant labor market. The district court neither explicitly rejected nor applied the labor market of the City of Detroit, which in 1970 was about 46 percent black.[4]

### C. LEAA Funds

The district court found that a second justification put forward by the defendants for instituting affirmative action was not established. This was a purported danger that grants from the Law Enforcement Assistance Administration (LEAA) were in jeopardy because of police department employment practices. We find no error in this determination, but it is not dispositive of the case.

### D. Operational Needs

The third position of the defendants addressed by the district court was the claim that "the operational needs of the department required employment and promotion of greater number of blacks." 446 F.Supp.

---

**4.** The labor market in this instance is defined as Detroit residents age 25 and over who have completed high school.

at 997. The court rejected what it termed the "amorphous claim" that more minority officers were needed to provide effective police service to the Detroit community. This claim was further characterized as follows:

Stripped to its barest form this argument rests upon the premise that blacks can communicate and cooperate better with blacks than can whites. . . . 446 F.Supp. at 1001.

The court found "no factual basis for this belief" that more black officers would improve police service and was not persuaded by evidence offered to show decreases in the crime rate and citizen complaints after affirmative action was instituted. Rather than concluding that affirmative action served the Department's needs, the court believed it a disservice:

Diametrically opposed to the void of competent evidence concerning the claim that the affirmative action plan improved the overall effectiveness of the department is evidence, which the Court accepts as fact, that the inclusion of race as a promotional criterion damages departmental morale and the quality of work of all officers. The record evidence demonstrates, which the Court accepts as fact, that a police officer's effectiveness, as a professional law enforcement officer both within the department and the community in which he serves, is dependent upon his education, skill, training, attitude and sense of professionalism. The unalterable pigmentation of his skin has no bear-

ing upon these facts and neither enhances nor depreciates his professional enforcement effectiveness. Defendants' claim that operational needs of the department required more blacks on the police force is rejected by the Court as being factually unsupported by any competent evidence. 446 F.Supp. at 1002 (footnote omitted).

## III.

## THE DISTRICT COURT'S CONCLUSIONS OF LAW

The district court concluded that plaintiffs had made a *prima facie* case of racial discrimination under each theory of liability and that defendants failed to rebut it.

### A. Title VII, Title VI and § 1981

Defendants violated § 703(a) of Title VII, the court found, by instituting a promotional plan which discriminated against white candidates by preferring black candidates. The court held that § 703(j) precluded reliance on racial balancing as a legitimate non-discriminatory reason for the failure to select the white officers for promotion.

The district court equated the operational needs defense with the "bona fide occupational qualification" exception in § 703(e) of Title VII.[5] Because that statute does not include race and color as possible bona fide occupational qualifications, the court concluded that operational needs failed as a legal defense. It believed that the affirmative action plan did not fit Title VII's "limited customer preference exception." 446 F.Supp. at 1005.

---

5. 42 U.S.C. § 2000e–2(e):

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualifica-

tion reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

The court declined to consider evidence of discriminatory practices prior to March 1972, the effective date of amendments to Title VII which brought municipal governments within its scope. Pub.L. 92–261, 86 Stat. 103. Based on its conclusion that post-Act proof of discrimination was lacking, the court held that the promotion plan violated Title VII by establishing impermissible racial quotas. The court went on to state that even if a court had ordered the plan, the plan would be unlawful because past discrimination is a prerequisite to judicial relief under Title VII. The district court summarized its view of voluntary affirmative action as follows:

However, even if there had been proof of prior discrimination against blacks, Section 706(g) does not grant the employer, acting alone, the prerogative of fashioning quota type relief. This conclusion is based upon several observations. First, the prohibition of Section 703(a) of Title VII is directed solely to employers and not to the courts. Second, Section 706(g) directs that the courts are empowered to fashion remedies for violations of Section 703(a) and does not grant the same authority to the employer. To be sure voluntary compliance in eliminating unfair labor practices is the central theme of Title VII and is preferable to court action. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). However, installation of remedies designed to correct past unfair labor practices which discriminate against certain racial groups is a far cry from the equitable relief intended by Section 706(g). While Congress recognized that remedies must be fashioned to correct prior discriminatory practices and to cure the ill effects of past discrimination, it was cognizant of the fact that courts alone are in a position to afford due process to all concerned in determining the necessity for and in fashioning such relief. *Reeves v. Eaves*, 411 F.Supp. 531 (N.D.Ga.1976); *Chmill v. City of Pittsburgh*, 31 Pa.Cmwlth. 98, 375 A.2d 841 (1977). *Compare*, Michigan Compiled Laws Annotated 37.2210. All will agree

that relief in the nature of a quota is extreme and should be approached and imposed only with utmost care and caution in order that such extraordinary relief will be uniform and in existence only so long as is necessary to achieve the intended purpose. An employer who readily admits it has discriminated in its employment practices in the past, intentionally or otherwise, can hardly be placed in a position of trust and confidence on a plateau with the courts who, without the stigma of the prior impermissible action, sit unblemished in fashioning relief for such prior discrimination. The reasoning that unless an employer can fashion quota type relief the voluntary compliance theme of Title VII will be subverted is particularly naive. Voluntary quota relief by an employer, as this case evidences, merely changes the racial makeup of the plaintiff class. Accordingly, the Court holds, as a matter of law, that quota relief, when fashioned by the employer without the assistance and direction of the court, is not permitted and runs afoul of Section 706(g) of Title VII.

446 F.Supp. at 1010 (footnote omitted).

The above conclusions also led the court to hold that the affirmative action plan violated Title VI and § 1981 as well as Title VII. These conclusions were not discussed.

### B. Equal Protection

The plaintiffs also presented a valid constitutional claim, the court found. The rule of strict scrutiny was applied to the affirmative action plan. Referring to its Title VII finding that no proof of prior unlawful discrimination existed, the court decided that no prior constitutional violations justified the plan. The essential element of an equal protection violation, discriminatory purpose or intent, was absent because the record was "absolutely void of prior discriminatory purpose on the part of defendants toward blacks." *Id.* at 1014.

In addition, after concluding that the operational needs defense was based on "provincial beliefs" not borne out by the record, *id.*, the court found that operational needs

would not constitute a compelling state interest even if the evidence were otherwise.

If better public communication would exist by hiring more blacks and promoting more blacks to supervisory positions then the problem lies in a racially motivated populus. In the eyes of this Court catering to such racial prejudice cannot be said to be "compelling". On the contrary, the Court would consider it to be pandering. If the defendants' claim of "operational need" can be considered as compelling then apparently any all white community, via the police department, could lay claim to such a "compelling interest" in forming a basis to reject all non-whites.

446 F.Supp. at 1016 (footnote omitted).

The district court's view of race-conscious remedies is summarized by this language in its opinion:

Until racial discrimination is uprooted from employment practices the seeds of racial harmony will never be sown either in this city or the country. However, the fact that a racial group, *any* racial group, suffered its own special injustice does not make one such group different in the eyes of the law—for the remedy for racial discrimination is not more racial discrimination. In this day and age race is an impermissible criterion for judging either the employee's qualifications or the employer's needs.

*Id.*

### IV.

Our discussion is arranged under various headings which, in sum, treat the significant findings and conclusions and cover all the claims and defenses of the parties.

#### A. Prior Discrimination

■ The holding of the district court on which this appeal essentially turns is that there was no showing of prior discrimination against blacks by the Detroit Police Department. This conclusion, based on errors of law and an impermissibly restrictive view of the evidence, must be reversed.

■ The district court's findings of fact are binding on this court unless they are clearly erroneous. Fed.R.Civ.P. 52(a). However, whether prior discrimination occurred is a conclusion of law based on subsidiary findings of fact. As stated by the Seventh Circuit:

The statement that discrimination exists for the purposes of establishing liability under Title VII or under the Constitution . . . is as much a conclusion of law as a finding of fact. A distinction must be drawn between subsidiary facts to which the "clearly erroneous" standard applies, and the ultimate fact of discrimination . . . . Accordingly, we will make an independent examination of whether the Police Department's employment practices, as a matter of law, were proscribed under Title VII or the equal protection clause. *United States v. City of Chicago*, 549 F.2d 415, 425 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *See also Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508, 516 (5th Cir. 1976).

Reexamination of the law and evidence reveals that the district court's conclusion that the Detroit Police Department did not engage in unlawful discrimination was erroneous.

■ 1. *Employment Data.* The district court held that statistical evidence of prior discrimination was not entitled to any weight whatever. Statistical evidence of racially disparate impact of employment practices alone may establish a statutory violation. See *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 307–8, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Under some circumstances, such evidence may also demonstrate a constitutional violation. See *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266 and n. 13, 97 S.Ct. 555, 50 L.Ed.2d 450 (1972).

The evidence in this case showed that "the number of whites appointed far outdistanced the number of blacks appointed"

from 1944 to 1968, and from 1968 to 1975 there existed "a significant difference between the number of black and white applicants and the number of black and white appointees." 446 F.Supp. at 998. However, the court rejected the evidence because of a "lack of statistical verity." *Id.*

The conclusion that flaws in the data deprived it of any probative value is itself flawed. The court dismissed the 1944–1968 data for want of labor market data from the Detroit Standard Metropolitan Statistical Area (SMSA) for the same period. This data would be compared to police employment to determine whether the black proportion of the police department was much smaller than the black component of the labor market, a condition which would support an inference of discrimination.

The rejection of the data on this basis was proper only if the district court's insistence on this metropolitan-wide labor market benchmark was proper. Defendants presented evidence based on city population and city labor market comparisons. For example, their evidence indicated that from 1944 to 1973, new hires by the Department included 13.7 percent blacks. If hiring had conformed to the racial proportion of the Detroit labor market,[6] black new hires would have constituted 23.6 percent of all appointments in that period.

■■ The district court also rejected the statistical evidence because of a lack of "applicant flow data" until 1968 and data reporting errors thereafter. The district court seemed to require proof to a mathematical certainty, but there is no such requirement. *Vulcan Society of N. Y. C. Fire Dept. v. Civil Service Commission*, 490 F.2d 387, 393 (2d Cir. 1973). Deficiencies in the data base "may, of course, detract from the value of such evidence," *Teamsters*, 431 U.S. at 340 n. 20, 97 S.Ct. at 1857 n. 20, but ordinarily would not obliterate its evidentiary value. There was no indication that the reporting errors accounted for the "striking racial imbalance" indicated by the data. *Vulcan*, 490 F.2d at 392. In short,

none of the defects cited by the district court were fatal and it was "unfair to ignore [the figures] entirely." *Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1021 n. 6 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

■ Viewed in the light of all the evidence we hold that the district court's finding that the statistical evidence is "susceptible to a multitude of conclusions," 446 F.Supp. at 998, is clearly erroneous. The court found that the disparity between white and black police employment was "significant" and that the pre–1973 entry level examinations "may have constituted a source of discrimination against blacks." 446 F.Supp. at 1000. A number of black officers testified to the existence of a pattern of specific discriminatory practices which they had experienced and observed. No explanation for the underrepresentation of black officers and sergeants other than systematic exclusion appears on the record.

■ Even standing alone, the statistical data was evidence of discrimination. As the Supreme Court stated in *Teamsters*, supra:

> Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.

431 U.S. at 340 n. 20, 97 S.Ct. at 1856–1857 n. 20.

The district court found that the defendants had not presented the proper statistical data, even if it were otherwise reliable. The court concluded that a comparison of the racial proportions of the police force and the Detroit SMSA labor market demonstrated "no 'significant disparity' regarding black representation on the Detroit Police

**6.** See note 4.

Department." 446 F.Supp. at 1006. This conclusion is dependent on the court's selection of the Detroit SMSA labor market as "*the* proper labor market for comparison." 446 F.Supp. at 996 (emphasis added).

While the metropolitan labor market may be "*a* proper comparison," *Hazelwood,* 433 U.S. at 308, 97 S.Ct. 2736 (emphasis added), the availability of one appropriate benchmark is no warrant for rejection of other data which are also probative. The courts of appeals have recognized the value of other benchmarks and approved the use of city population—a standard specifically rejected by the district court—in cases involving public agencies which provide services citywide. *E. g., Afro American Patrolmens League v. Duck,* 503 F.2d 294, 299 (6th Cir. 1974) (police); *Boston Chapter, NAACP, supra,* 504 F.2d at 1020 n. 4, 1027 n. 17 (firefighters, city and metropolitan population); *Vulcan Society, supra,* 490 F.2d at 398 (firefighters); *Erie Human Relations Commission v. Tullio,* 493 F.2d 371, 372–73 (3d Cir. 1974) (police).

■■■ The selection of the SMSA labor market as the sole benchmark was not warranted on the basis that the Department recruited some officers from outside the boundaries of the city. This is especially true in view of the adoption of a city-residency requirement during the period in question. Rather, the "usefulness [of statistics] depends on all of the surrounding facts and circumstances." *Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1857. In this case, the fact that the police department had a residency requirement and served a city-only population made a comparison with city population and labor market data eminently proper.

■■■ Application of these benchmarks indicates a gross disparity between black employment in the Department and black representation in the city's labor market and general population. In 1974, the Department was 17.23 percent black, the district court found. Data from the 1970 census show that the Detroit labor market was 45.8 percent black and the city population was 43.7 percent black.

The metropolitan labor market was only 18.6 percent black in 1970. But the district court's comparison of 1970 census data, the most recent available, to 1974 police employment could not refute the pattern of racial disparity standing alone. If general population trends were any guide, it was distinctly possible that by 1974 the metropolitan labor force had become increasingly black. Thus, 1970 census data could not be compared fairly with 1974 police employment data. A proper comparison, between 1970 labor market and police statistics, yields a significant disparity. The metropolitan labor market was 17.23 percent black in that year while the Department employed only 11 percent black officers.

2. *Prior Discrimination: The Title VII Claim.* The district court rejected the defense of prior discrimination in part because

. . . statistics regarding pass/fail rates on the entry examination antedating March 24, 1972 are inconsequential in determining if there had been a prior Title VII violation. Further, as the Findings of Fact demonstrate, shortly after March 24, 1972, there was no disparate impact upon blacks as a result of entry examinations or any other portion of the entry process.

446 F.Supp. at 1006 (footnote omitted).

March 24, 1972 is the effective date of Pub.L. 92–261, 86 Stat. 103, which amended Title VII to include "governments, governmental agencies [and] political subdivisions." 42 U.S.C. § 2000e(a). The district court relied on *Hazelwood, supra,* for the proposition that a governmental employer who provides equal employment opportunities on that date and thereafter cannot be held liable solely on the basis of prior discrimination. 433 U.S. at 309, 97 S.Ct. 2736.

However, the Supreme Court in *Hazelwood* made clear that only a public employer who "made *all* its employment decisions in a *wholly* nondiscriminatory way" after the effective date of the Act would be immune from liability. *Id.* (emphasis added). In a footnote to the portion of the opinion quoted by the district court, the Supreme Court wrote:

This is not to say that evidence of pre-Act discrimination can never have any probative force. Proof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change.

433 U.S. at 309–310 n. 15, 97 S.Ct. at 2742–2743 n. 15.

 Where there is at least some evidence of post-Act discriminatory practices and effects, pre-Act evidence of a similar nature is relevant to the conclusion of post-Act discrimination. If there is no evidence of post-Act discrimination, the public employer cannot be held liable under Title VII.

 There was evidence of post-Act discrimination in this case which made the evidence of pre-Act employment practices relevant. The district court conceded that it was not until "shortly after" the effective date of the Act that the Department was able to eliminate the racially disparate impact of the hiring process. 446 F.Supp. at 1007. In fact, it was not until 1973 that the unvalidated entry level exam which failed greater numbers of black than white applicants was finally abandoned. See 446 F.Supp. at 1000. In addition, changes in other aspects of the entry level hiring process which had racially disparate effects or afforded opportunities for discrimination continued until 1973.

 Moreover, discriminatory acts which might not give rise to legal liability may nonetheless be sufficient to justify a voluntary remedial affirmative action plan. Thus evidence of pre-Act discrimination in the present case was relevant to a legitimate defense. The test under Title VII of voluntary affirmative action is whether the action is consistent with the anti-discrimination policy of the statute. See *United Steelworkers of America v. Weber*, —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). Prior discrimination which would constitute a violation but for the effective date of the statute is cognizable in concluding that the employer's purpose in implementing affirmative action was consistent with the statutory purpose of eliminating discriminatory employment practices and their effects. When the question is what a public employer *may* do rather than what it *must* do, evidence of pre-Act discrimination is relevant to the propriety of ostensibly remedial racial preferences.[7]

In *Weber*, the Supreme Court rejected many of the legal principles on which the district court based its decision. The Court held that Title VII does not prohibit all remedial, race-conscious affirmative action plans. —— U.S. at ——, 99 S.Ct. 2721. The district court in this case relied heavily on the court of appeals decision in *Weber* in concluding that Section 703(j) of Title VII required rejection of defendants' claim that racial balancing is a permissible reason for employment preferences. 446 F.Supp. at 1004.

In reversing the court of appeals in *Weber*, the Supreme Court found that Section 703(j) states only what Title VII does not *require* of an employer. That section contains no explicit prohibition against voluntary employer action. The Court found a

---

7. Appellees argued in a supplemental brief that Title VII has a different meaning when applied to governmental employers than when applied to private employers. This argument rests on the theory that the commerce clause was the source of legislative power for the original version of Title VII (which applied only to private employers), but the enforcement clause of the Fourteenth Amendment was the source of congressional power in enacting the 1972 amendments to Title VII which brought public employers within the scope of the statute.

This argument was considered recently by the Fifth Circuit in *Scott v. City of Anniston*, 597 F.2d 897 (1979). That court correctly decided that "whether the employer be private or public, the same prerequisites to Title VII liability apply . . . ." 597 F.2d at 900. We agree that reliance on the Fourteenth Amendment as the source of legislative power for the 1972 amendments does not limit their substance to the minimum protections provided by the Fourteenth Amendment. See also *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

"natural inference" from this omission that Congress chose not to forbid all voluntary race-conscious affirmative action. —— U.S. at ——, 99 S.Ct. 2721.

The district court also relied on *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), in concluding that Title VII prohibits the implementation of an affirmative action plan which in any way prefers black employees over white. 446 F.Supp. at 1003. However, in *Weber*, the Supreme Court held that *McDonald* expressly left this question open. —— U.S. at ——, 99 S.Ct. 2721. Further, it found that a principal purpose of Title VII is to induce voluntary solutions to racial discrimination, one form of which is race-conscious affirmative action employment. In view of the statutory purpose, § 703(a) and (d) cannot be read as literal, absolute prohibitions against race-conscious action to eliminate discrimination. —— U.S. at —— — ——, 99 S.Ct. 2721.

The basic error in the district court's approach to the Title VII issue was that it determined what the Act requires of employers and then concluded that all other actions with racially disparate consequences are forbidden. But as the Supreme Court made clear in *Weber*, in a case of this kind where "reverse discrimination" is claimed, the question is not what Title VII requires or what a court might order to remedy a proven Title VII violation. Rather, the question is what voluntary actions may lawfully be taken. As Justice Blackmun noted in his concurring opinion in *Weber*, a preferential hiring plan which seeks to alleviate an imbalance caused by traditional practices of job segregation is a reasonable voluntary response "whether or not a court, on these facts, could order the same step as a remedy." —— U.S. at ——, 99 S.Ct. at 2731. Under *Weber*, the district court's holding that "quota relief, when fashioned by the employer without the assistance and direction of the court, is not permitted . . . ," 446 F.Supp. at 1010, cannot stand as a matter of law.

Consideration of the uncontroverted evidence before the district court and the very findings made by the court compel the conclusion that the Department was guilty of racial discrimination in violation of Title VII. Hiring data spanning the period 1944 to 1975 demonstrated a consistent, "significant" racial disparity. Police work force statistics revealed a gross underrepresentation of black police officers when compared with city population, city labor market, and proper metropolitan labor market data.

No nondiscriminatory explanation for these disparities was offered. On the contrary, there was substantial evidence that the Department had a "custom" or "tradition" of racial discrimination in job assignments, conducted unvalidated entry tests with racially disparate effects, maintained physical job requirements with discriminatory impact, and created opportunities for racial discrimination in the background investigation of job applicants.

In addition, where judicial findings of discrimination in a particular job category are so numerous as to be a proper subject for judicial notice, affirmative action is permissible. *Weber*, —— U.S. at —— n. 1, 99 S.Ct. 2721. Racial discrimination by law enforcement agencies in the employment of police officers has resulted in numerous findings of unlawful discrimination. See, e. g., *Afro American Patrolmens League v. Duck*, 503 F.2d 294 (6th Cir. 1974); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission*, 482 F.2d 1333 (2d Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *Erie Human Relations Commission v. Tullio*, 493 F.2d 371 (3d Cir. 1974); *Mims v. Wilson*, 514 F.2d 106 (5th Cir. 1975); *Morrow v. Crisler*, 491 F.2d 1053 (5th Cir. en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *NAACP v. Allen*, 493 F.2d 614 (5th Cir. 1974); *United States v. City of Chicago*, 549 F.2d 415 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); see also President's Commission on Law Enforcement and the Administration of Justice, *Task Force Report: The Police* 169, 174 (1967) (citing sur-

veys which found racially exclusionary hiring practices and racially discriminatory job assignments in Detroit Police Department).

Based on the findings of the district court and uncontroverted evidence of prior discrimination by the Department we conclude that the affirmative action program did not violate Title VII. See *Weber, supra.*

3. *Prior Discrimination: Title VI and § 1981.* The district court did not explain its holding that the affirmative action plan violated Title VI. It apparently concluded that a public entity which receives federal funds may not establish any race-conscious preference program even to remedy past discrimination. We find this reading of 42 U.S.C. § 2000d to be too expansive.[8]

The Supreme Court has held that states may take voluntary race-conscious action to achieve compliance with the law. *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (reapportionment); *McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971) (school desegregation). Moreover, the Constitution imposes on states a duty to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The district court erred in holding that only a court can effect a remedy upon a judicial finding of prior discrimination, for as Chief Justice Burger wrote in *Swann,* "Judicial authority enters only when local authority defaults." 402 U.S. at 16, 91 S.Ct. at 1276.

Title VI must be construed to avoid the conclusion that the statute interferes with the operation of the Constitution. It is presumed that Congress did not intend to prohibit state and local governments from performing their constitutional duty to eliminate discrimination and its effects. Therefore, while Title VI may prohibit acts of discrimination, it cannot be read to forbid remedies which are constitutionally required and unavoidably race-conscious.

The validity of the affirmative action plan under Title VI thus turns on whether it was effected to comply with a constitutional duty to remedy prior discrimination. This construction of Title VI is not inconsistent with the view that the statute forbids only that discrimination which offends the Constitution, as expressed by at least four Justices in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978):

> In view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.
>
> 438 U.S. at 287, 98 S.Ct. at 2747 (Opinion of Powell, J.).

> We agree with Mr. JUSTICE POWELL that, as applied to the case before us, Title VI goes no further in prohibiting the use of race than the Equal Protection Clause of the Fourteenth Amendment itself.
>
> 438 U.S. at 325, 98 S.Ct. at 2767 (Opinion of Brennan, White,[9] Marshall and Blackmun, JJ.).

The district court also held without explanation that the affirmative action plan violated 42 U.S.C. § 1981. Apparently, the court interpreted the statute as a prohibition of all race-conscious programs without regard to whether they fulfill a constitutional duty to remedy past discrimination.

Section 1981 is derived from the Civil Rights Act of 1866. That Act was intended to implement the Thirteenth Amendment and eliminate the vestiges of slavery. See

---

8. Whether Title VI may be the basis of a private cause of action need not be decided because the district court committed an error of substantive law in premising liability on Title VI.

9. Justice White would hold that Title VI provides no private cause of action and would not reach its merits. See 438 U.S. at 287, 98 S.Ct. 2733.

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439–440, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). The statute also has a close relationship to the Fourteenth Amendment. The statute was a model for the Amendment, *Mahone v. Waddle*, 564 F.2d 1018, 1029–30 and n. 21 (3d Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978), and was reenacted after approval of the Amendment. Enforcement Act of 1870, Ch. 114, § 18, 16 Stat. 144; see *Jones*, 392 U.S. at 436, 88 S.Ct. 2186.

 What the Constitution forbids generally, § 1981 forbids with some specificity. The constitutional genesis of § 1981 also means that what the Constitution permits, § 1981 must also permit. Because the Constitution not only permits but requires race-conscious action to remedy a constitutional violation, it was error to hold that § 1981 bars such action.

4. *Prior Discrimination: The Constitutional Claim.* The district court held that no race-conscious affirmative action program was permissible unless the defendants proved by unequivocal direct evidence that any disadvantages suffered by black applicants and candidates for promotion resulted from purposeful, intentional discrimination. Typical of several statements to this effect is the following:

Aside from statistical comparisons defendants have claimed that prior to the installation of the voluntary "affirmative action" plan blacks were treated differently than whites, essentially a claim of disparate treatment. While there was no evidence in this record showing such an allegation to be true, even if defendants had shown prior differential treatment to blacks vis a vis whites the claim of prior unconstitutional discrimination against blacks, without more, would fall short of a constitutional violation as it must be shown that the alleged differential treatment was *because* of the race of the group. Proof of discriminatory *purpose, intent, or motive*, be it evil or innocent, is required and absent such proof, as in the case at bar, there can be no constitutional violation.

446 F.Supp. at 1013–14 (footnote and citation omitted).

The district court relied primarily on *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and quoted extensively from the majority opinion. *Washington v. Davis* holds that proof of discriminatory purpose or intent is required to establish a constitutional violation and that proof of disparate racial impact from state action is not alone sufficient. This requirement applies to allegations of racial discrimination in various factual contexts. 426 U.S. at 239–41, 96 S.Ct. 2040.

However, the district court failed to follow those portions of the Supreme Court's opinion which give guidance on evaluating proof of discriminatory purpose:

This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race. *Yick Wo v. Hopkins*, 118 U.S. 356, [6 S.Ct. 1064, 30 L.Ed. 220] (1886).

\* \* \* \* \* \*

Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact—in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires—may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant,

but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

426 U.S. at 241–42, 96 S.Ct. at 2048–2049.

■ In *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 565, 50 L.Ed.2d 450 (1977), the Supreme Court set forth a number of "subjects of proper inquiry in determining whether racially discriminatory intent existed." The racial impact of the official action was identified as "an important starting point." The historical background of decisions having disparate racial impact and the contemporary statements of members of the decision-making body were also types of evidence considered relevant. The Court quite recently reviewed the standard of proof for constitutional violations and held that "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." *Columbus Bd. of Education v. Penick,* —— U.S. ——, ——, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979). The foreseeable effects standard may be employed "as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn." *Id.* In short, discriminatory intent may be established by any evidence which logically supports an inference that the state action was characterized by invidious purpose.

■ The district court erred in treating evidence of disparate impact of hiring and promotion practices as having no probative value. It found no relevance in the longstanding and gross underrepresentation of blacks on the Detroit police force. Its suspicions were not aroused by its own finding that the pre–1973 entry level written examination had serious flaws which tended to work against black applicants.

■ The court similarly erred in finding that there was no evidence on the record of disparate treatment. 446 F.Supp. at 1013. In light of uncontradicted evidence of discriminatory treatment in job assignments,

this finding was clearly erroneous. There was uncontradicted evidence that the traditional practice of the Detroit police department had been to assign black officers to foot patrols only, denying them the use of patrol cars for years. After assignment of black officers to scout cars was begun, there were "white" and "black" cars. If the only black car was in use or out of operation black officers were required to walk rather than being permitted to use a white car. Black officers were permitted to work only in black neighborhoods. It was also uncontradicted that the traditional practice had been to exclude black officers from assignments to certain desirable details. Further, black officers were rarely given visible posts at headquarters and for many years black and white officers were never paired.

The natural consequence of these practices was to make police work unattractive to blacks and to limit the experience of blacks who were employed as police officers in ways which could hinder their chances for advancement. No non-discriminatory explanation was given for any of these practices. On the contrary, past and present uniformed police officers and civilian officials were convinced that these practices represented purposeful discrimination. Unlike the district court, we believe that evidence of these practices and their consequences was entitled to serious consideration.

■ When veteran police officers attempted to state the reasons for these practices as related to them by their former police supervisors, the evidence was excluded as hearsay. Thus, while the district court required proof of discriminatory purpose, it excluded the most probative evidence on the issue: contemporaneous statements by persons in positions to know the purpose of the Department's traditional practices. Exclusion of this evidence of discriminatory purpose as hearsay was error under the Federal Rules of Evidence. Rule 803(3)[10] makes such testimony admissible as

---

**10.** Rule 803(3) states:

(3) Then existing mental, emotional, or physical condition. A statement of the de-

clarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling,

an exception to the hearsay rule, regardless of whether the declarant is available as a witness.

█ The City's own determination that it had been guilty of racial discrimination in the past was also entitled to more serious consideration than the district court gave it. The resolution approved by the Board of Police Commissioners conceded the role of prior discrimination in creating the Department's racial imbalance. In light of this admission, the statistical evidence of disparate impact, the tradition of discriminatory treatment and the testimonial evidence of discriminatory purpose, we believe it was error for the district court to require the city to prove specific acts of discrimination and produce the individual victims of these acts.

We have no such clear authority in dealing with the constitutional issues as *Weber* supplies with respect to Title VII. However, we conclude that the opinion of Justices Brennan, White, Marshall and Blackmun in *Regents of the University of California v. Bakke, supra,* 438 U.S. at 324, 98 S.Ct. 2733, offers the most reasonable guidance. Applying the principles set forth in that opinion, we conclude that the district court committed a number of errors of law.

█ Thus it was error to require proof that the persons receiving the preferential treatment had been individually subjected to discrimination, for "it is enough that each recipient is within a general class of persons likely to have been the victims of discrimination." *Bakke, supra,* 438 U.S. at 363, 98 S.Ct. at 2786.

And, rather than requiring a direct showing of past intentional discrimination by the City of Detroit against identified individual black applicants for hiring and promotion, the district court should have determined first whether appropriate findings were made by a public body "with competence to act in this area." *Id.* at 325, 98 S.Ct. at 2766.

█ It was also error to require that there be judicial determination of past discrimination for a state to undertake a race-conscious remedy, as stated by the district court. This requirement would be "self-defeating" and would "severely undermine" voluntary remedial efforts. *Id.* at 364, 98 S.Ct. 2733.

It is apparent that the district court misapprehended the nature of remedial race-conscious action and failed to conduct the proper inquiry into such action. As the four Justices wrote in *Bakke,* earlier cases involving discrimination against minorities are often inapposite and a more precise meaning of "strict scrutiny" is required when considering state action taken for the purpose of remedying past discrimination. 438 U.S. at 357, 98 S.Ct. 2733.

█ Thus it appears that, rather than requiring a direct showing of past intentional discrimination by the City of Detroit against identified individual black applicants for hiring and promotion, the district court should have considered the finding by the BPC, a public body with competence to act. This should have led to the following inquiries, at least: whether "there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access [and promotion] of minorities . . ." *Id.* at 362, 98 S.Ct. at 2785; whether any discrete group or individual is stigmatized; and whether use of race is reasonable in light of the objectives of the plan. *Id.* at 373–76, 98 S.Ct. 2733. If this analysis establishes the need for remedial action, the test of reasonableness requires a showing that no other approach offers a practical means of achieving the ends of the program in the foreseeable future. *Id.* at 376, 98 S.Ct. 2733. If the affirmative action plan satisfies these criteria, it does not violate the Equal Protection Clause of the Fourteenth Amendment. The

---

pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

district court conducted none of these inquiries, and its finding that the affirmative action program violated the constitutional rights of the plaintiffs must be reversed.

### B. Operational Needs

 The defense of operational requirements is claimed by the defendants to be an independent justification for the affirmative action plan.[11] The basis of the claim is that improved law enforcement is a sufficiently important reason in itself for affirmative action.

As noted above, the district court gave little consideration to the testimony of high-ranking police officers that a more representative black presence on the Detroit force was required. The court referred to the "provincial beliefs" on which the claim was based and characterized the argument as a simplistic claim that blacks communicate better with blacks.

The argument has considerably more substance. It is based on law enforcement experience and a number of studies conducted at the highest levels. *E. g.*, National Advisory Commission on Criminal Justice Standards and Goals, *Police* (1973); National Commission on the Causes and Prevention of Violence, Final Report: *To Establish Justice, To Insure Domestic Tranquility* (1969); Report of the National Advisory Commission on Civil Disorders (1968); President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Police* (1967). As these reports emphasize, the relationship between government and citizens is seldom more visible, personal and important than in police-citizen contact. See *To Establish Justice, supra* at 145; *Report on Civil Disorders, supra* at 300 (New York Times edition). It is critical to effective law enforcement that police receive public cooperation and support. *Report on Civil Disorders, supra* at 301; *Task Force Report: The Police, supra* at 144–45, 167; *Police, supra* at 330.

These national commissions recommended the recruitment of additional numbers of minority police officers as a means of improving community support and law enforcement effectiveness. In fact, the benefits of Negro officers were recognized as early as 1931 by the "Wickersham Commission." *Report on the Causes of Crime* 242, National Commission on Law Observance and Enforcement (Vol. I, 1931).

In 1967, a presidential commission stated the proposition offered by the defendants in this case:

> In order to gain the general confidence and acceptance of a community, personnel within a police department should be representative of the community as a whole.

*Task Force Report: The Police, supra* at 167.

This need extends to the higher ranks in police departments, such as the rank of sergeant involved in this case:

> If minority groups are to feel that they are not policed entirely by a white police force, they must see that Negro or other minority officers participate in policy-making and other crucial decisions.

*Id.* at 172.

The presence of a mostly white police force in minority communities can be a "dangerous irritant" which can trigger, as it did in Detroit in 1967, a violent response. *Report on Civil Disorders, supra* at 315, 120; see also *id.* at 84–108 (chronology of events of 1967 Detroit civil disorders).

The testimony of defense witnesses in this case was completely consistent with the findings of these studies and with the view widely accepted in law enforcement that a police force must reflect the makeup of the community it serves. Former Police Commissioner John F. Nichols testified to a keen awareness of "the community requirement and the socio-political reality that re-

---

11. The district court believed that defendants also intended to assert operational needs as a defense to Title VII under Section 703(e), which provides for a limited statutory exception based on "bona fide occupational qualifica-

tions." However, the argument seems to us intended as a defense to the claimed equal protection violation rather than the Title VII claims.

quired a higher percentage of black officers to be made a part of the Department." Chief of Police William H. Hart testified that this need involves the trust between a community and its police force and that representativeness is essential to citizen cooperation and crime prevention. He also stated that the need is much deeper than a perception that persons of the same race communicate better with each other than with someone from a different racial group. James Bannon, Executive Deputy Chief with 28 years of experience on the force and a doctoral degree in sociology, also testified. In addition to his testimony regarding historical discriminatory treatment of black officers in Detroit, he cited both the need for more black officers to perform specialized tasks such as surveillance and the need to improve the community's perception of police. He viewed affirmative action as a tool needed to change an image of the police among black Detroit residents as part of the white establishment with little interest in their problems.

The argument that police need more minority officers is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police. In short, the focus is not on the superior performance of minority officers, but on the public's perception of law enforcement officials and institutions. It is therefore apparent that the district court misconstrued this justification for affirmative action, and that the justification offered by defendants is a substantial one.

### C. The 50/50 Promotion Ratio

Because the district court focused on other issues, the record is incomplete with respect to the propriety of the 50/50 promotional ratio adopted by the Department. The test to be applied is whether the voluntarily adopted ratio is reasonable.

The reasonableness test includes a determination whether the affirmative action plan is "substantially related" to the objectives of remediation of prior discrimination and improved law enforcement. *Bakke, supra* 438 U.S. at 359, 98 S.Ct. 2733. A racial preference plan is reasonable when it provides an effective remedy for past discrimination without unnecessarily trammeling the interests of white candidates for promotion. *Weber, supra,* —— U.S. at ——, 99 S.Ct. 2721. The reasonableness test has been applied by the federal courts on review of quotas ordered by trial courts. *See, e. g., Tullio, supra,* 493 F.2d at 374–75; *Carter v. Gallagher,* 452 F.2d 315, 330–31 (8th Cir. 1971) (en banc), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); see also *United States v. Chicago, supra,* 549 F.2d at 436–37 (abuse of discretion standard).

On remand, the district court must consider the factors enumerated in *Weber, supra.* It must consider the urgency of effectuating the state's objectives, practical limitations in doing so, and the degree of hardship to be borne by whites. However, concern for the interests of white employees cannot be allowed to thwart achievement of the state's goals. It is reasonable for some persons innocent of wrongdoing to bear some burden [12] in order to correct the harsh effects of a grievous wrong of constitutional dimensions and enhance public safety by improved law enforcement. See *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 774–75, 777–78, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); see also *Teamsters, supra.*

The district court should also consider that a goal which seeks the same racial proportion among employees as in the labor force will ordinarily be reasonable. "[A]bsent explanation, it is ordinarily to be expected that nondiscriminatory hiring

---

12. This is not a case in which white employees are deprived of vested employment rights. At most, the white patrolmen had an expectation of promotion under certain conditions. These conditions were altered by the BPC under authority of the City Charter. See *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 778, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." *Teamsters, supra,* 431 U.S. at 340 n. 20, 97 S.Ct. at 1856–1857 n. 20. Although no one can say with absolute precision how much of the Department's racial disparity in employment is due to racial discrimination, logic and fairness require a presumption that where racial discrimination has been purposeful and pervasive, all racial imbalance within the discriminating organization occurred as its result. See *Keyes v. School Dist. No. 1,* 413 U.S. 189, 198–205, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

Thus a ratio requirement equivalent to the racial proportion of the labor market ordinarily achieves the racial balance which would have existed but for discrimination.

## V.

## CONCLUSION

The basic holding of the district court which appears to have been decisive in its treatment of all claims and defenses is that there was no showing of prior discrimination by the Detroit Police Department. We believe this conclusion is based on an impermissibly restrictive view of the proof in the case. Thus, while conceding that the entry level examinations used prior to 1973 "may have constituted a source of discrimination against blacks," the court concluded that affirmative action was forbidden because no discrimination existed after installation of the Detroit Furcon exams in that year. This holding overlooks completely the continuing effect of the pre–1973 exclusionary practices. These practices had the effect of freezing the status quo. The fact that job-related, non-discriminatory examinations for sergeant were instituted in 1973 did not deprive the City of the power to deal with the lingering effects of past discriminatory practices.

We have not discussed every argument made by the parties and *amici curiae.* To do so would unreasonably extend what is already a lengthy opinion. However, we have treated the issues which are central to a decision of this particular case.

The judgment of the district court is reversed and the injunction entered by it is vacated. All claims of the plaintiffs based on the contention that the affirmative action program for promotion to sergeant violates Title VI, Title VII and § 1981 are dismissed. The case is remanded for further consideration of the constitutional issues. This will require a determination of whether it has been established that the Department engaged in intentional discrimination against blacks, and if not, whether the affirmative action plan is justified under the alternative claim of operational needs. The District Judge to whom the case is assigned will determine whether further proof is required.

If the court concludes that prior acts of the Department did deprive blacks of rights guaranteed them under the equal protection clause, it must then determine whether the affirmative action plan, with its 50/50 ratio, was a reasonable remedial response. *Bakke* and *Weber* make it clear that a case involving a claim of discrimination against members of the white majority is not a simple mirror image of a case involving claims of discrimination against minorities. One analysis is required when those for whose benefit the Constitution was amended or a statute enacted claim discrimination. A different analysis must be made when the claimants are not members of a class historically subjected to discrimination. When claims are brought by members of a group formerly subjected to discrimination the case moves with the grain of the Constitution and national policy. A suit which seeks to prevent public action designed to alleviate the effects of past discrimination moves against the grain, and the official actions complained of must be subjected to the analysis prescribed in *Weber* and the plurality opinion in *Bakke* which we find controlling.

In the event the district court concludes that the affirmative action plan may remain in force, it will be necessary to determine a formula for its eventual termina-

tion. In approving the plan in *Weber*, the Supreme Court noted that it was a temporary measure to eliminate a manifest racial imbalance, not a measure to maintain a given balance. *Steelworkers v. Weber, supra,* —— U.S. ——, 99 S.Ct. 2721. Unless the parties are able to agree on provisions for termination of the plan in event of its approval, this will be an ingredient of the final judgment.